772 So.2d 910 (2000)
STATE of Louisiana
v.
Michael J. PLEASANT.
No. 99-KA-2349.
Court of Appeal of Louisiana, Fourth Circuit.
November 8, 2000.
*912 Harry F. Connick, District Attorney of Orleans Parish, Julie C. Tizzard, Assistant District Attorney of Orleans Parish, New Orleans, Louisiana, Attorneys for Plaintiff/Appellee, State of Louisiana.
Catherine J. Smith, New Orleans, Louisiana, and George A. Blair, III, New Orleans, Louisiana, Attorneys for Defendant/Appellant, Michael Pleasant.
(Court composed of Judge JOAN BERNARD ARMSTRONG, Judge STEVEN R. PLOTKIN, Judge PATRICIA RIVET MURRAY).
MURRAY, Judge.
Defendant Michael Pleasant appeals his conviction for manslaughter claiming that there was insufficient evidence to convict, and that the sentence of thirty years was excessive. For the following reasons, we affirm the conviction and sentence.

STATEMENT OF THE CASE
Defendant Michael Pleasant, Nathaniel Pleasant, and Carl Williams, a/k/a Carl Pleasant, were indicted for the second degree murder of Syer Carter. On November 16, 1998, Michael Pleasant and Carl Williams were tried together by a twelve-member jury which found Mr. Pleasant guilty of manslaughter and Mr. Williams not guilty. The State entered a nolle prosequi as to Nathaniel Pleasant. Mr. Pleasant's motion for new trial was denied, and he was sentenced to serve thirty years at hard labor. A motion for reconsideration of sentence was denied after hearing. This appeal followed.

STATEMENT OF THE FACTS:
On June 21, 1997, at 12:30 p.m., Syer Carter was murdered in the 2100 block of Second Street.
Lolita Vallery, first cousin of Syer Carter, testified that she lived at 2529 Dryades with Syer, and that she knew Michael Pleasant and Carl Williams for about fifteen years from the neighborhood. She further testified that on the day of the murder, at around 12:15 or 12:20 p.m., she, Syer, and Jimmy Ratcliff were at 2510 Dryades, which was across the street from her house. She stated that as Syer and Ratcliff got into a heavy discussion, Michael Pleasant approached the three, and told Ratcliff that he was too old to be handled like that by someone younger. Ratcliff was 62 years old and was "like a stepfather" to Syer. She said that Syer told Mr. Pleasant that he had nothing to do with it as it was a family dispute. Ms. Vallery testified that Mr. Pleasant then cursed Syer, and pointed his hand in his face. Ms. Vallery tried to get them to stop fighting, but Mr. Pleasant told Syer, "Well, if you ever come around the corner on Danneel Street, I'm a kill your fucking ass." She said Mr. Pleasant then walked away and repeated the threat. Syer left to change his shirt and told her that he was going to go back to the funeral home.[1] Syer began walking away, but then asked a friend for her bicycle. Ms. Vallery stated that this was the last time she saw Syer alive. Several minutes later, she heard gunshots. She went inside her home to call 9-1-1, then went around the corner where she saw an ambulance and police cars already on the scene. Ms. Vallery explained that Syer had the nickname of "Rock" because he had a big head.
Under cross-examination, Ms. Vallery stated that two other persons, Ray Vallery and a boy named Derrick were also present when Michael Pleasant first approached her, Syer and Ratcliff. She did *913 not see Carl Williams on the day of the murder; however, she did see Allen Addison at the funeral earlier in the day.
Allen Addison testified that he knew both Michael Pleasant and Syer Carter, and that he witnessed the argument between them on Dryades between Second and Third Streets. He did not see Syer with a weapon, but heard Mr. Pleasant tell Syer that he had better not come around the corner. Addison stated that as he walked out of the grocery store on the corner of Second and Dryades, he saw Carl Williams running in the street, holding his side. Mr. Addison followed Carl and saw Mr. Pleasant standing in the middle of Second Street holding a gun wrapped in a white towel. Mr. Pleasant held the gun on Syer, and when Carl Williams ran up to him, Mr. Pleasant said something and started shooting Syer. He said that Williams pulled out a gun and also started shooting. Mr. Addison testified that prior to being shot, Syer raised up his shirt, indicating that he did not have a gun, and began backing up toward the sidewalk. As Syer turned to walk away, the shooting began. Mr. Addison said that he hollered at Mr. Pleasant and Syer just before the shooting started in an effort to stop the shooting, but when shots were fired at him, he turned and ran. He admitted that he was carrying a gun and that he returned fire. Mr. Addison recalled that there was a third person standing next to Carl Williams, but he could not see who it was. Mr. Addison testified that Mr. Pleasant continued shooting Syer on the ground. He recalled that Shannon Carter, Syer's younger brother, was also on the scene.
Shannon Carter testified that on the day of the shooting, he and his brother had been to the funeral of Syer's girlfriend's mother. He said that they left the funeral home and went to Jimmy Ratcliff's house on Dryades. He did not hear the discussion between Syer and Ratcliff or the one between Syer and Michael Pleasant. He saw Mr. Pleasant leave, and then saw Syer get on his bicycle and go toward Danneel Street. Shannon then went to the corner grocery store on Danneel where he could see his brother on the sidewalk talking to someone he could not see. He testified that he then saw Mr. Pleasant come through a gate and into the street, carrying a rifle with a towel over it. He heard Mr. Pleasant say, "What's up now?" Shannon stated that his brother raised up his shirt with both hands as he turned away from Mr. Pleasant. That was when Mr. Pleasant shot him. He stated that Carl Williams was across the street also shooting toward Syer. He recalled that there was a third person next to Williams; but, he could not tell who it was although he looked like someone named "Bo-Bo," Michael Pleasant and Carl Williams' cousin. Shannon denied seeing his brother with a weapon. He stated that Mr. Pleasant also fired at him, and he ran home toward Second Street. He did not know if anyone picked up bullet casings off the ground after the shooting. Shannon denied telling the police that the third man was Nathaniel Pleasant even after being shown a statement and his grand jury testimony in which he stated that the third person was Nathaniel.
Eunice Pleasant testified that Michael Pleasant and Carl Williams were her nephews. On the day of the incident, she was at her mother-in-law's grocery store in the neighborhood where the shooting took place. She knew both Syer and Shannon Carter, and said that she overheard a discussion between Syer and Michael on Dryades Street, wherein Syer told Michael to get off of his turf and that if he caught him on his turf again, he would kill Michael and whoever was with him. Michael told Syer to get out of his face, and Michael walked toward her. She said that she tried to get Michael to file a police report, but he refused to do so. Ms. Pleasant stated that she then walked to the grocery store on Danneel where she saw Syer on the opposite side of the street. Michael, who had been walking with her, *914 ran ahead, and she heard Syer and Michael engage in another threatening conversation. Michael then ran down Second Street from Danneel toward Saratoga; approximately a minute and a half later, she heard shooting. Ms. Pleasant testified that prior to the shooting, Shannon Carter ran into her with a gun in his hand, but did not say anything. After the shooting, she saw Carl Williams who told her that he thought Michael was dead. She suggested to Carl that they wait for the police before going to see what had happened, but Carl went ahead without her. When she arrived on the scene, only three people were there, a lady and two men she did not know. Ms. Pleasant testified that Michael ran toward Saratoga because Syer had a gun and was chasing him. She stated that Syer had a gun in his waistband when she originally saw him on Dryades.
Esteban Eugene testified that on the day of the shooting, he was talking with a group of friends at the corner of Second and Danneel. He said that Michael Pleasant came running from Dryades to Second and Danneel and told them to get off the corner. Before Michael could explain why, he ran off when several young men came from a nearby lot on Danneel. Mr. Eugene stated that Rock (Syer) was one of those young men. When the group of young men got to the corner of Second and Danneel, Michael had already run toward Saratoga Street. Mr. Eugene testified that Rock said, "You better run. You gon' [sic] keep on running, or else I'm a kill you." Mr. Eugene further testified that Rock looked at him and his friends and said that he would kill anyone that he caught talking to Michael Pleasant. Mr. Eugene said he saw Rock's hand on the handle of a gun in his waistband. Rock and his companions then walked towards Third and Danneel where Rock got a bicycle from a young lady. Rock went down Third and met up with Michael at Saratoga and Second. At the same time, Mr. Eugene saw Carl Williams running down Second Street toward Michael; but before Williams got there, Michael had already shot Rock. Mr. Eugene testified that he did not see Williams holding a gun, and that the weapon Michael held was covered up with some type of material. He saw Michael and Rock push each other, and then Michael shot Rock. Mr. Eugene did not see Rock remove his gun from his waistband. Immediately after the shooting, Mr. Eugene went to the corner grocery because he was upset, and could hear more shots being fired.
Bryant Chisolm testified that he lived at 2130 Second Street and that Syer Carter was shot two or three houses down from his house. He said that prior to the shooting, he was on his way to the store when he heard Syer and Michael Pleasant arguing at the corner of Second and Dryades. They were both making threatening comments to each other. Mr. Chisolm then followed Mr. Pleasant down Second Street. As he stood at the corner of Second and Danneel, he saw Syer go down an alley to Danneel, get on a bicycle, and head toward Third Street. Mr. Chisolm stated that Syer went around the block and met up with Mr. Pleasant at Second and Saratoga. Mr. Chisolm walked home and heard shots just as he entered his house. He did not see Syer with a weapon, but did see Michael Pleasant with an SKS. He could not recall if anything was wrapped around the gun. Mr. Chisolm did not see Carl Williams or Nathaniel Pleasant at the time of the shooting. About ten or fifteen minutes after the shooting, he saw Syer's family and Carl Williams at the scene.
Michael Pleasant testified that he had known Syer and Shannon Carter a long time and that on June 21, 1997, he first saw Syer when he turned the corner at Third and Dryades, and saw him arguing with Jimmy Ratcliff. He asked Mr. Ratcliff what he and "that `lil youngster" were fussing about. Mr. Ratcliff turned to him and said, "Rock could go fuck his self [sic]." Syer then began cursing him and Ratcliff. Mr. Pleasant took off his shirt in preparation for a fistfight, and asked Syer *915 if he had something to get off his chest. However, when Syer showed him a gun, he left, walking around the corner to Danneel and Second where he saw several people he knew, including Esteban Eugene and his Aunt Eunice. He could see Syer in the middle of Dryades Street as he stopped to explain what had happened to one of the men on the corner. He then saw Syer reach under his shirt and run toward Danneel Street. He did not, however, actually see a gun. Michael stated that he then ran up Second Street, although no one was chasing him at that point, and he did not know where Syer was. In the 2100 block of Second, he went to the home of his friend Roger to ask for a gun. Roger's grandmother told him that Roger was at work. He then saw Syer on a bicycle, but did not ask Roger's grandmother to call the police or to allow him into her home. Instead, Michael stated that he went into Roger's backyard and got an assault rifle from a shelf in the tool shed. He denied covering the gun. When he came from the backyard, he heard Syer telling him to come out and take it like a man. Michael testified that he began walking toward Syer, talking to him in an effort to calm him down. The two brushed up against each other, Syer reached under his shirt, and Michael began running backwards and shooting. Mr. Pleasant stated that Syer was facing him when the shooting began. Mr. Pleasant denied any knowledge of guns, and that, in fact, this was the first time he had ever fired a gun. He did not check to see if the gun had bullets in it when he took it from Roger's shed, but knew that the gun had a "clip" in it. Mr. Pleasant stated that he knew Syer had a gun so it was necessary for him to shoot to save his own life. He recalled that there were other people, including Allen Addison and Syer's brother, Shannon, who were there and had guns, and he heard shots coming at him as he ran. Under cross-examination, Mr. Pleasant was asked why no casings or the gun Syer allegedly was carrying were recovered from the scene. He replied that maybe Syer's people picked them up. Mr. Pleasant insisted that he only pulled the trigger once. He stated that he hid the gun at another friend's house, but did not wish to reveal the friend's name.
Detective Michael Mims testified that he investigated the shooting of Syer Carter, and that Shannon Carter identified Michael Pleasant, Carl Williams, and Nathaniel Pleasant as the people who shot his brother. Det. Mims was told that Michael Pleasant had an assault rifle wrapped in a towel, and that the other two men had semi-automatic handguns. He stated that he did not expect to find any ejected cartridges from the assault rifle because it was wrapped up, but he did expect to find cartridges from the handguns. However, he did not find any ejected cartridges at the crime scene, and admitted that it was possible that someone had cleaned the scene. He arrived on the scene about five minutes after the shooting, but did not know how much time elapsed before the arrival of the first officers.
Dr. Richard Tracy testified that the autopsy of Syer Carter revealed scratches and scrapes on the victim's face which were consistent with his falling onto the street. Carter had six bullet wounds in the back around the left shoulder blade and thigh, and one in the left chest, as well as several grazing wounds. Dr. Tracy stated that at least four or five of the wounds would have been immediately fatal. Many of the wounds were consistent with the victim lying face down and being shot by someone standing over him. Dr. Tracy recovered several bullet fragments from the body. The victim's bodily fluids tested negative for drugs and alcohol.
Kenneth Leary, a firearms examiner, testified that most of the items he examined were too deformed to make a determination of the caliber, and were unsuitable for comparison because they contained no identifiable marks. He said that a 7.62 by 39-millimeter bullet and copper jacket fragment were recovered *916 during the autopsy of the victim, but he could not determine if the same weapon had fired the bullet and jacket fragment. Leary testified that a 7.62 by 39-millimeter rifle was commonly known as an AK-47 or SKS, both of which were semi-automatic rifles that ordinarily ejected empty cartridge cases when fired. Because there were several unknown pieces of ammunition fired that could not be linked to one another, it is possible that more than one weapon was used.

DISCUSSION:

ERRORS PATENT
A review of the record reveals one error patent. The trial court imposed sentence immediately after denying Mr. Pleasant's motion for new trial without observing the twenty-four delay period required by La.C.Cr.P. art. 873, and without a waiver of the delay. Failure to observe the delay is harmless where the defendant does not complain of his sentence on appeal. State v. Collins, 584 So.2d 356 (La. App. 4 Cir.1991), but Michael Pleasant has complained about his sentence in this appeal. However, it does not appear that Mr. Pleasant was prejudiced by the court's failure to comply with art. 873. Several months after he was originally sentenced, following a full hearing, the trial court denied Mr. Pleasant's motion to reconsider his sentence. Therefore, remand for resentencing in this case would be a useless formality. See, State v. Augustine, 555 So.2d 1331 (La.1990) (Remand for resentencing due to the failure to observe the mandatory twenty-four hour delay was not a useless formality where reimposition might result in a lesser sentence). We find, therefore, that a remand for resentencing is not necessary.

ASSIGNMENTS OF ERROR NOS. 1 & 2:
In these assignments of error, Mr. Pleasant complains that the State failed to prove his guilt beyond a reasonable doubt and that the trial court erred in denying his motion for new trial on this basis. He argues that the State failed to show that the killing of Syer Carter was not in self-defense and that the testimony of the prosecution witnesses was not credible.
The standard of reviewing a claim of insufficient evidence is whether, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the elements of the offense proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Rosiere, 488 So.2d 965 (La.1986). The reviewing court is to consider the record as a whole and not just the evidence most favorable to the prosecution; and, if rational triers of fact could disagree as to the interpretation of the evidence, the rational decision to convict should be upheld. State v. Mussall, 523 So.2d 1305 (La.1988). Additionally, the reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence. Id. The trier of fact's determination of credibility is not to be disturbed on appeal absent an abuse of discretion. State v. Cashen, 544 So.2d 1268 (La.App. 4 Cir.1989).
Manslaughter is a homicide that would be either first or second degree murder, but the killing is committed in "sudden passion or heat of blood caused by provocation sufficient to deprive an average person of his self-control and cool reflection." La.Rev.Stat. 14:31(A)(1). "Sudden passion" and "heat of blood" are not separate elements of the offense but are mitigating factors that exhibit a degree of culpability less than that present when the homicide is committed without them. State v. Lombard, 486 So.2d 106 (La. 1986).
A homicide is justifiable if committed by one in defense of himself when he reasonably believes that he is in imminent danger of being killed or receiving great bodily harm and that the homicide is *917 necessary to save himself from that danger. La.Rev.Stat. 14:20(1). When a defendant claims self-defense, the State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense. State v. Lynch, 436 So.2d 567 (La.1983); State v. Brumfield, 93-2404 (La.App. 4 Cir. 6/15/94), 639 So.2d 312. Regarding self-defense, it is necessary to consider whether the defendant had a reasonable belief that he was in imminent danger of losing his life or receiving great bodily harm and whether the killing was necessary, under the circumstances, to save the defendant from that danger. State v. McClain, 95-2546 (La.App. 4 Cir. 12/11/96), 685 So.2d 590. Although there is no unqualified duty to retreat, the possibility of escape is a factor in determining whether or not the defendant had a reasonable belief that deadly force was necessary to avoid the danger. Id. However, a defendant who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that the defendant desires to withdraw and discontinue the conflict. La. Rev.Stat. 14:21.
Looking at the evidence in the light most favorable to the prosecution, we find that the State carried its burden of proving that Michael Pleasant did not kill Syer Carter in self-defense. Although Syer Carter threatened Mr. Pleasant prior to his death, Bryant Chisolm, a defense witness, testified that Mr. Pleasant made threats as well. Esteban Eugene, another defense witness, testified that Syer did not have a gun in his hand when Mr. Pleasant started shooting. Further, instead of remaining in his friend's backyard and avoiding a confrontation, Mr. Pleasant sought out an assault rifle from a tool shed and confronted Syer Carter with it. No gun was found on Syer Carter, and most of the shots were in his back. The autopsy revealed that the track of one of the bullets indicated that Carter was on the ground when he was shot. Thus, regardless of the credibility of the prosecution witnesses, the record contains sufficient evidence to support the conclusion that Mr. Pleasant was not acting in self-defense when he shot Syer Carter. The trial court, therefore, did not err in denying the motion for new trial.

ASSIGNMENT OF ERROR NO. 3
In his third assignment of error, Mr. Pleasant complains that the court imposed an excessive sentence. He argues that the thirty year sentence, which represents three-quarters of the maximum sentence under La.Rev.Stat. 14:31 of forty years, is excessive because he had no prior convictions
Although a sentence is within the statutory limits, it may violate a defendant's constitutional right against excessive punishment. State v. Sepulvado, 367 So.2d 762 (La.1979). A sentence is unconstitutionally excessive if it makes no measurable contribution to acceptable goals of punishment, is nothing more than the purposeless and needless imposition of pain and suffering, and is grossly out of proportion to the severity of the crime. State v. Lobato, 603 So.2d 739 (La.1992); State v. Telsee, 425 So.2d 1251 (La.1983). The trial court has great discretion in sentencing within the statutory limits, State v. Trahan, 425 So.2d 1222 (La.1983), and the reviewing court shall not set aside a sentence for excessiveness if the record supports the sentence imposed. La.Code Crim. Proc. art. 881.4(D).
Generally, the reviewing court must determine whether the trial judge adequately complied with the guidelines set forth in La.Code Crim. Proc. art. 894.1 and whether the sentence is warranted in light of the particular circumstances of the case. State v. Soco, 441 So.2d 719 (La.1983); State v. Quebedeaux, 424 So.2d 1009 (La.1982). If adequate compliance with Article 894.1 is found, the reviewing court must determine whether the sentence *918 imposed is too severe in light of the particular defendant and the circumstances of the case. State v. Egana, 97-0318 (La.App. 4 Cir. 12/3/97), 703 So.2d 223. The articulation of the factual basis for the sentence is the goal of Article 894.1, not rigid or mechanical compliance with its provisions; and, where the record clearly shows an adequate factual basis for the sentence, resentencing is unnecessary even where there has not been full compliance with Article 894.1.
The court articulated no reasons for the thirty year sentence at the time it was imposed. However, the court refused to allow counsel for Mr. Pleasant to make an oral motion for reconsideration of sentence; instead the court required counsel to enter a written motion requesting a hearing. This action indicates that the court wanted to hear evidence about Mr. Pleasant's background that would enable it to reassess the sentence imposed.
At the hearing on the motion for reconsideration, Mr. Pleasant presented testimony from Carl Williams, James Thompson and Esteban Eugene that Syer Carter had come up with a gun and that Shannon Carter and Allen Addison, who were following Carter, started shooting first. Mr. Pleasant's stepfather testified that Michael Pleasant belonged to the First Street Methodist Church and had been employed with him doing roofing and renovation work.
The trial court made the following comments at the hearing:
Let me tell what my main concern is about this. It's not so much the facts, because the Court originally issued a 30-year sentence when the Court could have issued a 40-year sentence. I was hoping I would receive some testimony concerning the person, Michael Pleasant, not so much the facts. I'm aware of the facts. That's why I issued a 30-year sentence and not the maximum, 40-year sentence.
... That's whyand the jury was aware of the facts. I mean, he was charged with second-degree murder. The jury returned a verdict of manslaughter. So the jury evidently saw somethingdidn't see this as a specific intent to commit murder.
After hearing arguments from both sides, the trial court denied the motion for reconsideration. The court based its decision on the facts of the case, which it felt warranted a sentence that was ten years below the maximum allowable sentence.
Syer Carter was shot numerous times in the back with an assault rifle. Witnesses for the defense testified that Mr. Syrer did not have a gun at the time of the shooting. The trial court stated it had been presented with no compelling evidence to indicate that the sentence originally imposed was too severe. We find no error in the sentence it imposed. See State v. Major, 96-1214 (La.App. 4 Cir. 3/4/98), 708 So.2d 813, writ denied 98-2171 (La.1/15/99), 735 So.2d 647, (court affirmed thirty year sentences for manslaughter for each of two defendants who shot their victim with an assault rifle after getting into an argument in a nightclub, and then pursued him after he had driven away).
Accordingly, for the foregoing reasons, we affirm Mr. Pleasant's conviction and sentence.
AFFIRMED.
NOTES
[1] On the day of the incident, a funeral was being held for Syer Carter's girlfriend's mother.